HILES *v.* FIRST NATIONAL BANK AT FLINT.

1. WITNESSES—HUSBAND AND WIFE—HUSBAND DISINTERESTED WIT-
NESS—SPECIFIC PERFORMANCE.
In a suit by a married woman for the specific perform-
ance of an alleged oral agreement whereby decedent agreed
to convey all of her property to plaintiff in consideration
of plaintiff and her husband coming to live with her and
caring for her as long as she lived, the husband was not
disqualified as an interested witness from testifying as
to the existence of said contract, in view of 3 Comp. Laws
1915, § 11485, which provides that the husband has no
present interest in his wife's property, although the fact
of relationship should be considered in determining the
weight to be given to his testimony.

2. SAME—INTERESTED WITNESS DEFINED.
An interested witness is one who has a pecuniary interest,
having prospect of gain or loss.

3. SPECIFIC PERFORMANCE—ORAL CONTRACT—BURDEN OF PROOF.
In a suit for the specific performance of an oral contract
for the conveyance of real estate, the contract should be
clearly established in its essentials by a convincing pre-
ponderance of the evidence; the burden of establishing it
resting upon plaintiff.

4. CONTRACTS—ORAL CONTRACT MUST BE ESTABLISHED BY PROOF
THAT SATISFIES CONSCIENCE OF COURT.
The proof in support of an oral contract for the convey-
ance of real estate will be weighed with much care, and,
when considered with any facts or circumstances tending
to show its unreliability, must be such as satisfies the
mind and conscience of the court that the contract was
made as claimed.

5. SPECIFIC PERFORMANCE—ORAL CONTRACT TO CONVEY REALTY NOT
ESTABLISHED.
Where plaintiff's acts and conduct after decedent's death
are inconsistent with her present claim of an oral con-

[1]Witnesses, 40 Cyc. p. 2283; [2]Id., 40 Cyc. p. 2282; [3]Specific Per-
formance, 36 Cyc. pp. 689, 690; [4]Id., 36 Cyc. p. 690; [5]Id., 36 Cyc.
p. 689; 44 L. R. A. (N. S.) 733; 25 R. C. L. 307-310.

tract to convey to her real estate, the proof of its existence is not so clear and convincing as to warrant its specific enforcement notwithstanding there was some evidence tending to establish it.

Appeal from Genesee; Brennan (Fred W.), J.   Submitted October 14, 1926.   (Docket No. 101.)   Decided January 3, 1927.

Bill by Ethel M. Hiles against the First National Bank at Flint, administrator of the estate of Jennie M. Haight, deceased, and others for specific performance of an alleged land contract.   From a decree dismissing the bill, plaintiff appeals.   Affirmed.

*William L. Landon* and *Farley & Selby,* for plaintiff.

*Neithercut & Neithercut* and *Bishop, Blackney & Church,* for defendants.

SHARPE, C. J.   Jennie M. Haight died in the city of Flint on July 18, 1925, unmarried and intestate. Administration of her estate was granted to the defendant bank.   The plaintiff and the other defendants are her heirs and heiresses at law.   The appraised value of her real estate was $6,000, and of her personal estate $9,005.29.   Plaintiff, in this suit, seeks specific performance of an alleged parol agreement, entered into between her and the deceased in the fall of 1923, in which the deceased agreed that, in consideration of plaintiff and her husband closing their home and coming to live with her and caring for her as long as she lived, she would transfer all the property she owned at her death to the plaintiff.   She alleges that this agreement was fully performed on her part and that "although she (the deceased) often spoke of it, she had delayed making out the necessary conveyance and transfer of her property" until her death.   The trial court dismissed the bill.   Plaintiff appeals.

1. Was the husband a competent witness? In *Laird* v. *Laird*, 115 Mich. 352, where a suit was brought by a husband for specific performance of an oral contract to convey, claimed to have been made with the deceased, it was held that the wife was "an opposite party" and her testimony inadmissible to establish the contract. It was said that "she has a direct interest in the subject-matter of the litigation" because, if her husband was successful, she would thereby secure homestead and dower rights in the land, of which her husband could not deprive her without her assent. This holding was approved in *Abbott* v. *Jones,* 164 Mich. 598. But the construction placed upon the statute in the *Laird Case* was held not to be applicable in *Dunn* v. *Dunn's Estate,* 127 Mich. 385, where a husband makes claim for personal services rendered a decedent, because "if the claim is allowed, it belongs to the husband." This holding was approved in *Re Moon's Estate,* 219 Mich. 104. By parity of reasoning, it was held in *Re De Spelder's Estate,* 181 Mich. 153 (followed in *Re Turner's Estate,* 217 Mich. 359), that a husband may testify to such a contract made with his wife.

Defendants rely on the language in *Hanly* v. *Hanly,* 105 N. Y. App. Div. 335 (93 N. Y. Supp. 864), quoted with approval by Mr. Justice BIRD in *Kinney* v. *Kinney,* 220 Mich. 311, 316, wherein it was said that such a contract "must be clearly established by the testimony of disinterested witnesses." The question of the competency of the husband or wife as a witness was not there presented or considered. In passing upon the effect of this language, Mr. Justice CLARK, in *Denevan* v. *Belter,* 232 Mich. 664, 668, said:

"An interested witness is one who has a pecuniary interest, having prospect of gain or loss."

Under our statute (3 Comp. Laws 1915, § 11485), a husband has no present interest in any real estate

which may be acquired by his wife after their marriage. She may transfer or devise such property "with the like effect as if she were unmarried." The husband in this case had no such interest as disqualified him as a witness. That he is the husband of the plaintiff may, of course, be considered in determining the weight which should be given to his testimony. *Denevan* v. *Belter, supra.*

2. Is the contract established? The deceased had been engaged as a teacher in the city schools for many years. She had also acted as housekeeper for her father prior to his death in 1921. Plaintiff's husband testified that she visited their home frequently.

"Miss Haight made a proposition to my wife about coming and staying with her. She and Ethel made the agreement; I didn't have anything to do with it. There was talk on more than one occasion.

"*Q.* What did Miss Haight say to your wife?

"*A.* She said if my wife would come there and take care of her she would leave her her property.

"*Q.* When?

"*A.* When she was through with it.

"*Q.* State whether or not your wife consented to that arrangement?

"*A.* She consented.

"*Q.* How many times was that talked between your wife and Miss Haight?

"*A.* A number of times.

"*Q.* Before you moved there?

"*A.* Yes, sir.

"*Q.* State whether or not you finally moved over to Miss Haight's?

"*A.* We moved over there, I couldn't say what time it was. It was 1922 or '23.

"*Q.* State whether or not you moved over there under this arrangement?

"*A.* We did.

"*Q.* Whether or not you consented to that arrangement?

"*A.* Yes.

"*Q.* You may state whether or not after you got

there and before Miss Haight's death, she said anything further about this?

"*A.* Yes, sir.

"*Q.* And what did she say?

"*A.* She said Ethel should have her property.

"*Q.* When?

"*A.* When she got through with it."

Frank J. Hardy, a partner with plaintiff's husband in business, testified that deceased said to him, "Ethel (meaning the plaintiff) is going to have my home," and on another occasion she said, "As I told you before, when I am done with my property, Ethel gets it."

The arrangement, as testified to by plaintiff's husband, contains all the elements of an executed contract (*Prendergast* v. *Prendergast,* 206 Mich. 525), and evidences an agreement on the part of deceased to secure her property to plaintiff by transfer or will. The testimony of Hardy tends to show that such was her intention as to the home, although not expressive of any agreement on her part to do so.

The plaintiff's right to specific performance rests on the testimony of these two witnesses and the fact that plaintiff and her husband moved to the home of the deceased and lived there with her until her death. The services performed for her were trifling. Indeed, it may be said that deceased rendered as much service to plaintiff, who was crippled, as she and her husband rendered to the deceased.

The only person who could controvert the statement of these witnesses is the deceased, and her lips are sealed in death. The only test that can be applied to the weight to be given to the proof submitted in civil cases is that of preponderance. But, in actions such as this, where denial of the testimony submitted may not be had, this court has said that the contract "must be clearly established" (*Kinney* v. *Kinney, supra*); that "a parol contract for conveyance of real estate

should be clearly established in its essentials by a convincing preponderance of the evidence" (*Prendergast* v. *Prendergast, supra*) ; that "the burden rests upon plaintiff to clearly establish the agreement" (*Drolshagen* v. *Drolshagen,* 230 Mich. 444, 448), thus indicating that the proof in its support will be weighed with much care and, when considered with any facts or circumstances tending to show its unreliability, must be such as satisfies the mind and conscience of the court that the contract was made as claimed.

It is the contention of the defendants that the acts and conduct of the plaintiff after the death of Miss Haight are inconsistent with the claim that a contract had been made, and clearly evidence her expectation that the home would be given to her and her disappointment that it was not.   The defendants rely on the following:  Two days after the death of deceased, and before her body had been interred, plaintiff filed a petition in the probate court, asking for the appointment of her husband as administrator of the estate of deceased.   In this petition she stated that deceased died possessed of real estate of about the value of $6,500 and personalty of about the value of $7,500.   On August 21st, about a month after the death of deceased, plaintiff wrote her sister Julia:

"I can't write much this time for we're alone until there is a hearing, for Jennie left no will and the hearing is to be the 1st of September straightening up her property as many of the cousins as will sign off from this property here why then I can have it."

On August 24th she said to another sister in a letter to her:

"And those who of the cousins will sign off and give me this home here, why her money savings will be divided among the other cousins, so the attorney may fix a paper for her to be signed this home of hers to me.   Toot says she thinks I should get it after giving up my home and coming here to be with her, and she

told Rufe and Ira it was to be mine some day, and
Miss Kelly, the school principal, says it rightfully
should come to me."

On September 9th she wrote to either a sister or a
cousin:

"I'm writing more particularly for to ask you to
sign this quitclaim deed against Jennie's home here,
for she did not make a will, as has come to light yet,
and the attorney we employed for the estate prepared
this, and also one to send to Sr. Julia to sign and
several others so as to give me an opportunity to get
this home; she procrastinated it too long.   We have
three testimonies of Jennie's telling them she wanted
Ethel and Dwight to have this home.   *   *   *   Miss
Kelly, the principal at the school, says she thinks I
ought to have the home."

And on September 10th to a cousin:

"It's more to send these deeds to you and have them
signed by you two and returned by registered mail as
they're sent soon as you can return them, so that the
attorney can get busy and settle this up.   He wants
me to have this home.   He says I should have it and
he's getting what others will sign off to do so."

Forms of quitclaim deeds were inclosed in several
of these letters.   On September 16th plaintiff wrote
to a lady living in Lansing:

"I desire to inquire of you if Jennie made any par-
ticular remarks to you and Mr. Clark if I was of any
more a friend and cousin to her than some of the other
cousins after coming here to stay and live with her;
my meaning is you were speaking to her, as she told
me, of making out writings of her estate and not put
it off later.   During your conversation did she say
in what way she would divide it?   As the court have
found no will as yet and it having to be probated I
would appreciate learning from you what she remarked
to you and what she would give me for me giving up
our home to come and stay with her.   Miss Kelly says
she thinks I should have Jennie's home here."

In *Kraus* v. *Vandevanter, ante,* 168, when referring to somewhat similar acts, it was said:

"These incidents are hardly consistent with the claims now asserted that defendants own the farm as well as the personal property, and own it by virtue of an agreement made with the deceased in his lifetime."

When considering a somewhat similar state of facts, it was said in *Kimball* v. *Batley*, 174 Mich. 544, 551:

"The conduct of complainant after the death of decedent was inconsistent with his present position, and leads us to believe that his present claim was an afterthought, and not in good faith."

The record also contains a letter written by deceased on November 30, 1924, more than a year after plaintiff moved into her home, to a lady friend, in which she said, in speaking of plaintiff and her husband:

"Have an idea from what I can gather they intend to go to California in the spring, as she wants to be near her sister."

In our opinion, the trial court reached the right conclusion.

The decree is affirmed, with costs to appellees.

BIRD, SNOW, STEERE, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.